UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------X

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA.,
Individually, and as subrogee of
BELL ATLANTIC CORPORATION and
VERIZON COMMUNICATION INC.,
formerly d/b/a BELL ATLANTIC
CORPORATION,                                  **MEMORANDUM AND ORDER**

                            Plaintiff,        05 Civ. 4648 (NRB)

          - against -

TRAVELERS PROPERTY CASUALTY
COMPANY f/k/a THE TRAVELERS
INDEMNITY COMPANY OF ILLINOIS,

                            Defendant.

---------------------------------X
**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

      National Union Fire Insurance Company of Pittsburg, PA
("plaintiff" or "National Union"), individually and as subrogee
of Bell Atlantic Corporation and Verizon Communication, Inc.
("Verizon"), formerly d/b/a/ Bell Atlantic Corporation
(collectively, "Bell Atlantic"), brings this diversity action
against Travelers Property Casualty Company of America
("defendant" or "Travelers") for reimbursement and/or
contribution for payments made towards the defense and
settlement of two underlying class action lawsuits ("Underlying
Actions"). Both parties now move for summary judgment. For the

reasons set forth herein, plaintiff's motion is denied and defendant's motion is granted.

**BACKGROUND**[1]

**The Underlying Actions**

On October 23, 1997,[2] two Bell Atlantic Mobile Systems, Inc. ("BAMS") employees[3] initiated a class action lawsuit (the "McHenry Action") against Bell Atlantic before Judge Broderick in the United States District Court for the Eastern District of Pennsylvania. Defendant's Rule 56.1 Statement ("Def. 56.1 Stmt.") ¶ 18; Plaintiff's Rule 56.1 Statement ("Pl. 56.1 Stmt.") ¶ 23. Plaintiffs in the McHenry Action alleged that they had been Bell Atlantic employees who had been encouraged to accept employment with BAMS, which at the time was Bell Atlantic's new wireless subsidiary. Def. 56.1 Stmt. ¶ 20. However, this group of employees expressed concerns about losing benefits upon transferring to BAMS, as they were all already participants in a valuable pension plan through Bell Atlantic. Id. The McHenry plaintiffs claimed that in an effort to allay these concerns, Bell Atlantic, "acting in its own name and through the

---

[1] Except where noted, there are no genuine issues regarding the following facts.

[2] Bell Atlantic received notice of the McHenry Action no later than November 1997. Def. 56.1 Stmt. ¶ 30.

[3] As National Union points out, the complaint in the McHenry Action also states that, prior to accepting employment with BAMS, both plaintiffs had been employed by Bell Atlantic. Plaintiff's Response to Defendant's Rule 56.1 Statement ("Pl. Resp.") ¶ 18.

management of its wholly-owned subsidiary [BAMS]," represented to the potential transferees that their pension benefits would be "the same as or equivalent" to those they would receive if they remained at Bell Atlantic. Id. at ¶ 21. However, the McHenry complaint alleges that following the formation of a joint venture ("CellCo") between Bell Atlantic and NYNEX Corporation to jointly operate their cellular businesses, "the managements of [Bell Atlantic] and [BAMS] effected significant reductions in the pension plan benefits for plaintiffs and members of the Class."[4] Id. at ¶ 22. The McHenry plaintiffs alleged in part that Bell Atlantic and BAMS breached their fiduciary duties under Section 404(a) of ERISA.[5] Id. at ¶ 23. On May 18, 1999, Judge Broderick denied the McHenry defendants' motion for summary judgment, and the case was eventually settled and closed no later than November 2000. Id. at ¶¶ 24, 33.

---

[4] According to the court's opinion in the McHenry action, plaintiffs claimed "that if correct and complete pension information had been disclosed to them . . . they either would have never transferred to BAMS or . . . would have transferred to other Bell Atlantic companies." Def. 56.1 Stmt. ¶ 26.

[5] National Union asserts that the McHenry court recognized that the McHenry plaintiffs had also alleged a common law claim of estoppel. Pl. 56.1 Stmt. ¶ 13. Travelers asserts that this claim was actually treated by the McHenry court as an ERISA-based claim. Defendant's Response to Plaintiff's Rule 56.1 Statement ("Def. Resp.") ¶ 13.

On October 30, 1998,[6] another employee of BAMS[7] brought a separate, though virtually identical, action (the "Sollars Action") in the United States District Court for the Eastern District of Pennsylvania. Id. at ¶ 27; Pl. 56.1 Stmt. ¶ 24. The allegations in the Sollars Action were identical to those in McHenry.[8] Def. 56.1 Stmt. ¶ 29.

Bell Atlantic sought coverage in connection with the McHenry and Sollars Actions from its primary insurer, Travelers, but Travelers disclaimed coverage for both of the Underlying Actions.[9] Id. at ¶ 32. Subsequently, National Union, Bell Atlantic's excess insurer, agreed to participate in the actions.[10] Pl. 56.1 Stmt. ¶ 11.

---

[6] Bell Atlantic received notice of the Sollars action no later than February 1999. Def. 56.1 Stmt. ¶ 31.

[7] National Union notes that the Sollars plaintiff had formerly been employed by AT&T Communications. Pl. Resp. ¶ 27.

[8] Both National Union and Travelers highlight that the only difference with respect to the Sollars Action was the composition of the plaintiff class, which was made up of former employees of AT&T and its subsidiaries, affiliates, etc. Id. at ¶ 29; Def. 56.1 Stmt. ¶ 29.

[9] Travelers issued a disclaimer in the McHenry Action on or about December 28, 1998, and in the Sollars Action on or about July 15, 1999. Def. 56.1 Stmt. ¶ 32. The parties dispute whether Bell Atlantic ever informed Travelers that it disagreed with Travelers' coverage position. Pl. 56.1 Stmt. ¶ 9; Def. Resp. ¶ 9.

[10] National Union asserts, without any support, that it reimbursed Bell Atlantic for defense expenses incurred and also contributed to the settlement of both actions. Pl. 56.1 Stmt. ¶ 17. National Union also states that in connection with its contribution to the settlement of the McHenry and Sollars actions, Bell Atlantic assigned and transferred all of its rights under the Travelers/Bell Atlantic Policy to National Union. Id. at ¶ 18.

**The Current Action**

National Union now brings this action in its capacity as subrogee to enforce Bell Atlantic's alleged rights under the insurance policies Travelers had issued to Bell Atlantic (the "Travelers/Bell Atlantic Policies" or "Policies"). It also asserts claims for contribution for payments allegedly made by National Union in connection with the Underlying Actions. National Union alleges that, in violation of the terms of the Travelers/Bell Atlantic Policies, Travelers denied both a defense and indemnity coverage for the Underlying Actions.

**Travelers/Bell Atlantic Policy**

Travelers began issuing commercial general liability policies to Bell Atlantic in April 1995, renewing them on a yearly basis through April 2001. Def. 56.1 Stmt. ¶ 1. Of particular relevance to this case is the policy which Travelers issued to Bell Atlantic in April 1997 (the "1997 Travelers/Bell Atlantic Policy" or the "1997 Policy").

The 1997 Travelers/Bell Atlantic Policy had a coverage period of April 1, 1997 to April 1, 1998 and included a separate Employment Benefits Liability ("EBL") Coverage Form (the "EBL Form"), which insured against negligent acts, errors, or omissions "committed in the 'administration' of [a named

insured's] 'employee benefit program.'"[11]   Id. at ¶¶ 3, 4.
Elsewhere, the 1997 Travelers/Bell Atlantic Policy defined
"administration" as:

> a. Counseling employees, including their
> dependents and beneficiaries, with respect
> to the "employee benefit program";
> b. Handling records in connection with the
> "employee benefit program"; or
> c. Effecting or terminating any employee's
> participation in a plan included in the
> "employee benefit program."

Id. at ¶ 7.

The 1997 Travelers/Bell Atlantic Policy also contained an
exclusion (the "ERISA Exclusion") stating that the policy did
not apply to "[l]oss for which the insured is liable because of
liability imposed on a fiduciary by the Employee Retirement
Security Act of 1974, as of now or hereafter amended." Id. at ¶
8. In addition, Travelers asserts that the EBL Form referenced
an endorsement (the "CG T8 02 Form") containing a $250,000 per-
employee deductible, under which Travelers was obligated to
reimburse the insured only if the total amount exceeded $250,000
per employee.   Id. at ¶ 9.   National Union disputes this,
arguing instead that the deductible amount was to be applied to
each occurrence reported under the EBL Form, regardless of the

---

[11] This coverage was provided on a "claims made" basis, meaning
that it applied only to claims first made "against any insured during
the policy period." Id. at ¶ 5.
    In addition, as National Union notes, the EBL Form also stated
that Travelers had "the right and duty to defend" any suit seeking
damages for such actions. Id. at ¶ 4.

number of employees involved in any one occurrence.  See Pl. Resp. ¶ 9; Pl. 56.1 Stmt. ¶ 5.

Through its broker, Marsh & McLennan, Bell Atlantic requested in 1995 that Travelers divest BAMS and any BAMS-related risk from the Travelers/Bell Atlantic coverage program and to lower the premium accordingly.  Id. at ¶ 10.  Travelers eventually did so, reducing the premium by $175,000.[12]  Id. Despite this agreement, the 1995 policy and certain successive policies did not specifically reflect the BAMS "carve-out" ("the BAMS Carve Out Endorsement").  Id. at ¶ 11.  However, in a letter dated February 16, 2001, Travelers re-confirmed these arrangements with Bell Atlantic and stated that it was preparing endorsements which would reflect these arrangements by excluding BAMS under the various Bell Atlantic policies effective July 1, 1995, April 1, 1996, and April 1, 1997.[13]  Id. at ¶ 12.

---

[12] We note that while National Union ostensibly claims to deny this statement, it states only that "[t]he correspondence referenced by Travelers does not relate exclusively to the divestiture of BAMS, and does not establish that the reduction in premium is related to the divestiture of BAMS."  Pl. Resp. ¶ 10.

[13] As Travelers stated in its letter, the endorsements excluding BAMS were not added to subsequent policies because Bell Atlantic was acquired by NYNEX, which led to BAMS' incorporation back into the Bell Atlantic insurance program effective April 1, 1998.  Def. 56.1 Stmt. Ex. C.
    Travelers eventually renewed the 1997 Travelers/Bell Atlantic Policy in 1998 (the "1998 Travelers/Bell Atlantic Policy").  Aside from the BAMS Carve out Endorsement, the 1998 Travelers/Bell Atlantic Policy was identical to the 1997 Travelers/Bell Atlantic Policy and had a policy period of April 1, 1998 to April 1, 1999.  Id. at ¶¶ 15, 16.

The BAMS Carve Out Endorsement[14] provides that:

> 1. [Neither BAMS], nor any subsidiaries thereof, are Named Insured under this insurance; and
> 2. This Insurance does not apply to liability incurred by you [e.g., Bell Atlantic] or any of [Bell Atlantic's] subsidiaries arising out of the products, operations, acts or omission of [BAMS], or of any subsidiary [thereof].

Id. at ¶ 14.

**National Union Policy**

During the same time period, National Union issued to Bell Atlantic an Employee Benefit Fiduciary Liability Insurance Policy (the "National Union Policy"), which provided up to $50 million in coverage, subject to a $150,000 retention, for any claims first made and reported during the policy period, August 14, 1997 to August 14, 2003. Pl. 56.1 Stmt. ¶ 1. The National Union Policy provided Bell Atlantic excess coverage to any other applicable insurance. Id. at ¶ 2.

**Procedural History**

National Union filed its Verified Complaint ("complaint") in New York State Supreme Court on December 28, 2004. The complaint contains three counts. Count One, which is brought in

---

[14] Travelers asserts that this endorsement applied to the 1997 Travelers/Bell Atlantic Policy, while National Union denies that it was attached to the 1997 Policy, or was effective prior to March 7, 2001. Pl. Resp. ¶ 14. Elsewhere, however, National Union seems to admit that the 1997 Travelers/Bell Atlantic Policy included the BAMS Carve Out Endorsement. Id. at ¶ 16. For reasons discussed below, we need not weigh the merits of these arguments.

National Union's capacity as subrogee to enforce Bell Atlantic's alleged rights, asserts that Travelers wrongfully refused to provide coverage for the Underlying Actions. Count Two, brought by National Union for contribution, alleges that as a result of Travelers' wrongful disclaimer of coverage, National Union was forced to tender a defense and contribute towards the settlement of the Underlying Actions. Count Three alleges that Travelers' conduct constitutes deceptive acts and practices under General Business Law § 349 ("GBL § 349").

Travelers subsequently removed the action to this Court on May 12, 2005, and moved for summary judgment on September 22, 2005. National Union then cross-moved for summary judgment on November 28, 2005.

## DISCUSSION

A motion for summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In deciding a motion for summary judgment, the evidence submitted must be viewed in the light most favorable to the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Even if parties dispute material facts, summary judgment must be granted "unless there

is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Golden Pacific Bancorp. v. F.D.I.C., 375 F.3d 196, 200 (2d Cir. 2004) (internal citations and quotation marks omitted). In addition, once the moving party has made a sufficient showing, "[t]he non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." Id. (quoting D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998)).

## I. Statute of Limitations

### A. Count One

Travelers argues that National Union's first claim is barred by the statute of limitations, which it asserts is determined under Pennsylvania law. National Union argues that New York's statute of limitations, under which the claim would be timely, applies here.[15]

Where jurisdiction is based on diversity grounds, a federal court must apply the underlying conflict of law principles of the forum state. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). In cases involving contracts, New York courts apply a "center of gravity"

---

[15] Under Pennsylvania law, the statute of limitations for such claims is four years from the time of disclaimer, see McCarthy v. Scottsdale Ins. Co., No. C.A. 99-978, 1999 WL 672642, at *2 (E.D. Pa. Aug. 16, 1999), while under New York law, it is six years, see T&N PLC v. Fred S. James & Co., 29 F.3d 57, 59 (2d Cir. 1994).

or "grouping of contacts" approach, pursuant to which they consider "a spectrum of significant contacts, including the place of contracting, the places of negotiation and performance, the location of the subject matter, and the domicile or place of business of the contracting parties." Brink's Ltd. v. South African Airways, 93 F.3d 1022, 1030-31 (2d Cir. 1996) (citing In re Allstate Ins. Co. and Stolarz, 81 N.Y.2d 219, 227, 597 N.Y.S.2d 904, 908 (N.Y. 1993)). The purpose of this analysis is to determine which state has "the most significant relationship to the transaction and the parties." Zurich Ins. Co. v. Shearson Lehman Hutton, Inc., 84 N.Y.2d 309, 317, 618 N.Y.S.2d 609, 612 (N.Y. 1994) (citation omitted).

Accordingly, "[i]n cases involving insurance contracts, New York courts have considered factors such as the location of the insured risk, the insured's principal place of business, the residence of the insured, where the policy was issued and delivered, the location of the broker or agent placing the policy, where the premiums were paid, and the insurer's place of business." Wiener v. Unumprovident Corp., No. 00 Civ. 9315 (NRB), 2002 WL 31108182, at *2 (S.D.N.Y. Sept. 20, 2002) (collecting cases); see Seidel v. Houston Cas. Co., 375 F. Supp. 2d 211, 220 (S.D.N.Y. 2005). A key consideration in the choice of law analysis is which state's law "the parties understood was to be the principal location of the insured risk." Seidel, 375

F. Supp. 2d at 220 (quoting <u>Zurich</u>, 84 N.Y.2d at 318, 618 N.Y.S.2d at 613) (collecting cases).

Not surprisingly, the parties differ as to which events are most relevant for purposes of identifying the state with the greater relationship to this matter. Travelers argues that this Court should focus on the allegations in the Underlying Actions, which were filed in Pennsylvania and assert that "throughout the time of the events complained of [Bell Atlantic] maintained its principal place of business in Philadelphia, Pennsylvania."[16] Def. Mem. at 13. In addition, Travelers notes that the 1997 Travelers/Bell Atlantic Policy was issued to Bell Atlantic in Pennsylvania, a fact which it claims should be dispositive to this analysis.

National Union argues that we should focus instead on the fact that for the time period it deems relevant, the principal places of business of both National Union and Bell Atlantic were in New York. Specifically, National Union asserts that the relevant events -- Travelers' issuance of its policy to Bell Atlantic in 1997 and the filing of the Underlying Actions -- occurred well after Bell Atlantic had filed a merger agreement with the SEC indicating that it would be merging with NYNEX (and thus would be moving its headquarters to New York) and after

---

[16] Both the Underlying Actions define relevant class members as participants in the various plans between September and December 1995. Def. Reply at 14.

Bell Atlantic and NYNEX shareholders had approved the proposed merger. In addition, National Union argues that Travelers was aware of the impending merger well before it issued the 1997 Travelers/Bell Atlantic Policy. In support thereof, it cites numerous articles relating to the proposed merger which were published during the eleven month period prior to the inception of the 1997 Travelers/Bell Atlantic Policy.

The risks covered by the 1997 Travelers/Bell Atlantic Policy were not confined to any one principal location, given the multi-state nature of Bell Atlantic's operations. Despite this fact, we still must determine the state in which the risk was principally located. See Maryland Cas. Co. v. Continental Cas. Co., 332 F.3d 145, 153 (2d Cir. 2003) ("[W]here the insured risk is scattered throughout multiple states, courts still deem the risk to be located principally in one state.").

Both the broker and the insurer are located in states other than New York or Pennsylvania. We note that the 1997 Travelers/Bell Atlantic Policy was issued in Pennsylvania, and the insured was also located in Pennsylvania at the time the 1997 Policy was issued. However, for almost the entire time the 1997 Policy was in effect, Bell Atlantic's principal place of business was in New York. Were this action solely about the terms of coverage under the 1997 Policy, we might still be inclined to decide that Pennsylvania law should govern this

matter. However, this case also hinges on coverage under the 1998 Travelers/Bell Atlantic Policy, which presumably was renewed after Bell Atlantic had moved to New York. More importantly, this case is not a dispute over Bell Atlantic's liability for the conduct alleged in the Underlying Actions. Rather, this is fundamentally a dispute over which carrier should have to bear the costs of the defense and ultimate settlement of the Underlying Actions. In light of this posture, New York clearly has a greater interest in this case. Cf. id., at 155. Accordingly, New York applies here, and National Union's action is timely.

## II. Lack of Coverage

Defendant also moves to dismiss plaintiff's claims because the Travelers/Bell Atlantic Policies do not cover the subject claims.

### A. $250,000 Deductible

First, Travelers argues that plaintiff's claims are barred because the amount sought in connection with the Underlying Actions does not exceed the $250,000 per-employee deductible contained in the Travelers/Bell Atlantic Policies.[17] National Union asserts in response that the alleged deductible applies not per employee but per occurrence. At the very least,

---

[17] National Union does not dispute that if the $250,000 deductible applied on a per-employee basis, neither of the Underlying Actions would qualify for coverage.

National Union suggests that the wording of the CG T8 02 Form, which sets forth the deductible amount, viewed in conjunction with other parts of the Travelers/Bell Atlantic Policies, creates an issue of fact as to the parties' intent concerning the deductible.

Our reading of the Travelers/Bell Atlantic Policies supports Travelers' interpretation. Item Six of the EBL Form, entitled "Deductible," contains the text "$*** EACH EMPLOYEE" and references the CG T8 02 Form.[18] Def. Ex. A-2. The CG T8 02 Form in turn states that it modifies insurance provided under both the EBL Form and the Commercial General Liability ("CGL") Coverage Part (the "CGL Form"). Def. Ex. A-4. Specifically, the CG T8 02 Form modifies Section III of both the EBL and CGL Forms, stating that:

> [o]ur obligation to pay damages and allocated loss adjustment expense under this policy on your behalf applies only to the amount of damages and allocated loss adjustment expenses which are in excess of the deductible amounts stated in the schedule below.

Id. At the bottom of the CG T8 02 Form, the text under the section entitled "Deductible Schedule" reads "$250,000 Damages and allocated loss adjustment expense each occurrence, offense,

---

[18] Directly above Item Six is the line "*** SEE ENDORSEMENT CG T8 02." Id. Given the placement of this text directly above Item Six, as well as the additional references in Section IV of the EBL Form, there is no doubt that Item Six references the CG T8 02 Form for the amount of the deductible. National Union's argument to the contrary is frivolous at best.

act, error or omission as applicable." Id. In addition, Section IV of the EBL Form, which is entitled "Deductible", states in part that:

> 1. Our obligation to pay damages on behalf of the insured applies only to the amount of damages in excess of the deductible amount stated in Item 6 of the Declarations as applicable to "Each Employee." The limits of insurance applicable to "Each Employee" will be reduced by the amount of this deductible. . . .
>
> 2. The deductible amount stated in the Declarations applies to all damages sustained by an employee because of an act, error or omission covered by this insurance.

Def. Ex. A-3 (emphasis added). Reading these sections together, it is clear that the Travelers/Bell Atlantic Policies provides for a $250,000 deductible to be applied separately to each employee.

National Union's primary argument in support of its assertion that the $250,000 deductible applies on a per-occurrence basis is founded upon the wording of the Deductible Schedule. Specifically, National Union focuses on the fact that the Deductible Schedule provides for "$250,000 Damages and allocated loss adjustment expense each occurrence, offense, act, error or omission, as applicable."[19] Def. Ex. A-4 (emphasis

---

[19] In addition, National Union notes that Section III of the CG T8 02 Form elsewhere states that the deductible "applies to all damages and allocated loss adjustment expenses incurred as the result of any one occurrence, or offense, or act, error or omission (as applicable)." Def. Ex. A-4 (emphasis added).

added).  National Union suggests that the "each occurrence"
language directly conflicts with the "each employee" language
found elsewhere in the Travelers/Bell Atlantic Policies.

However, as Travelers asserts, and as explicitly stated in the
text, the CG T8 02 Form modifies both the EBL and the CGL Forms.
The latter covers injury or damage predicated upon an
"occurrence" and injury predicated upon an "offense."  Because
both Coverage Parts are modified by the CG T8 02 Form, Travelers
maintains that it is thus only natural that the CG T8 02 Form
should mention "occurrence" or "offense" (in reference to the
CGL Form) as well as an "act, error or omission" (in reference
to the EBL Form).  Indeed, the text of the CG T8 02 Form
supports this interpretation, as it states that it covers
damages and allocated loss adjustment expenses incurred "as the
result of any one occurrence, or offense, or act, error or
omission (as applicable)."  Def. Ex. A-4 (emphasis added).  In
short, the language of the CG T8 02 Form provides alternative
wording depending upon the applicable Coverage Part.[20]  Based on
our conclusion that the policy provides for a $250,000
deductible per employee and the acknowledgment that the per

---

[20] Similarly, the CG T8 02 Form omits any reference to "each
employee" because such language would apply only to the EBL Form.

employee damages do not exceed the deductible amount, there is no coverage under the Travelers/BAC Policies.[21]

**B. The EBL Form: "Administration"**

As discussed above, the EBL Form insured against any "negligent act, error, or omission" committed in the "administration"[22] of the insured's employee benefit program. Def. Ex. A-3. The parties have focused primarily on whether the allegations made in the Underlying Actions involved the "administration" of the employee benefit program. Travelers asserts that only ministerial activities would fall under the umbrella of "administration" while National Union argues that, as alleged in the Underlying Actions, Bell Atlantic effectively "counseled" employees and terminated their participation in the benefit program.

We note that courts in various jurisdictions have interpreted virtually identical definitions of "administration"

---

[21] We note here that National Union's attempt to introduce extrinsic evidence in support of its argument is inappropriate given the unambiguous wording of the Travelers/Bell Atlantic Policies.

[22] As stated above, "administration" is defined as:

> a. Counseling employees, including their dependents and beneficiaries, with respect to the "employee benefit program";
> b. Handling records in connection with the "employee benefit program"; or
> c. Effecting or terminating any employee's participation in a plan included in the "employee benefit program."

Def. 56.1 Stmt. ¶ 7.

to be limited to ministerial acts.  See, e.g., Maryland Cas. Co.

v. Economy Bookbinding Corp. Pension Plan and Trust, 621 F.

Supp. 410, 413 (D.N.J. 1985) (noting that a similar definition

"limits coverage to liability incurred in relatively routine,

ministerial acts").  Similarly, we find that the term

"administration" as defined in the Travelers/Bell Atlantic

Policies addresses ministerial actions rather than the kind of

deliberate, discretionary activity charged in the Underlying

Actions.  In short, the allegations made in the Underlying

Actions would not constitute "administration" as provided for in

the EBL Form.

Nevertheless, regardless of which definition of

"administration" is applied, National Union's claim still would

fail.  The EBL Form explicitly requires a "negligent act, error,

or omission."  Id. (emphasis added).  Thus, the Underlying

Actions, which allege that Bell Atlantic engaged in a deliberate

"scheme" to "induce" employees to accept employment with BAM and

also "concealed the true facts," see Def. Ex. D; Def. Ex. G,

would be precluded from coverage for this reason alone.[23]  Cf.

---

[23] In an apparent effort to skirt the requirement that any act,
error, or omission be negligent, National Union suggested at oral
argument that the facts in the underlying complaints essentially
alleged discrete, negligent actions.  Not only does this position fail
to comport with reality, but it contradicts National Union's
assertions elsewhere that the Underlying Actions allege that Bell
Atlantic engaged in a fraudulent scheme which argument they rely on in
connection with their contention that the scheme would be a covered
"occurrence."

<u>Hugo Boss Fashions, Inc. v. Federal Ins. Co.</u>, 252 F.3d 608, 621 (2d Cir. 2001) ("Where, for example, a complaint alleges an intentional tort, and the insurance contract provides coverage only for harms caused by negligence, there would be no uncertainty as to the applicability of the policy exclusion, and hence, no duty to defend the particular suit brought.") (collecting cases). Therefore, we find that this rationale provides an alternative basis for granting Travelers' motion for summary judgment.[24]

## III. Count Three

A prima facie case under GBL § 349 "requires . . . a showing that defendant is engaging in an act or practice that is deceptive or misleading in a material way and that plaintiff has been injured by reason thereof." <u>Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.</u>, 85 N.Y.2d 20, 25, 623 N.Y.S.2d 529, 532 (1995) (citation omitted). A plaintiff "must demonstrate that the acts or practices have a broader impact on consumers at large. Private contract disputes, unique to the parties, for example, would not fall within the ambit of the statute." <u>Id.</u>

Because plaintiff does not establish the kind of public harm required under the statute, and in light of our conclusion

---

[24] Having established two alternative bases for granting Travelers' motion, we do not consider the arguments pertaining to the ERISA Exclusion and the BAMS Carve Out Endorsement.

that there is no coverage under the Travelers/BAC Policies, Travelers' motion for summary judgment against Count Three also is granted.

## CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment is granted, and plaintiff's cross-motion for summary judgment is denied.

**IT IS SO ORDERED.**


Dated:     New York, New York
           May 26, 2006


                                    _____
                                    NAOMI REICE BUCHWALD
                                    UNITED STATES DISTRICT JUDGE

Copies of the foregoing Memorandum and Order have been mailed on this date to the following:

<u>Counsel for Plaintiff</u>

Kevin J. Windels, Esq.
D'Amato & Lynch
70 Pine Street
New York, NY 10270


<u>Counsel for Defendant</u>

Stephen M. Lazare, Esq.
Lazare Potter Giacovas & Kranjac LLP
950 Third Avenue
New York, NY 10022

that there is no coverage under the Travelers/BAC Policies, Travelers' motion for summary judgment against Count Three also is granted.

## CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment is granted, and plaintiff's cross-motion for summary judgment is denied.

**IT IS SO ORDERED.**

Dated:     New York, New York
           May 26, 2006

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

Copies of the foregoing Memorandum and Order have been
mailed on this date to the following:

Counsel for Plaintiff

Kevin J. Windels, Esq.
D'Amato & Lynch
70 Pine Street
New York, NY 10270

Counsel for Defendant

Stephen M. Lazare, Esq.
Lazare Potter Giacovas & Kranjac LLP
950 Third Avenue
New York, NY 10022